**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **SAMANTHA LYNN DRAKE,** | : | **Civil No.  1:22-CV-980** |
| | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **KILOLO KIJAKAZI**, | : | |
| **Acting Commissioner of Social Security** | : | |
| | : | |
| **Defendant** | : | |

**MEMORANDUM OPINION**

## I.   Introduction

The Supreme Court has underscored for us the limited scope of our

substantive review when considering Social Security appeals, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout
> administrative law to describe how courts are to review agency
> factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——,
> 135 S. Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-
> evidence standard, a court looks to an existing administrative record
> and asks whether it contains "sufficien[t] evidence" to support the
> agency's factual determinations. Consolidated Edison Co. v. NLRB,
> 305 U.S. 197, 229, 59 S. Ct. 206, 83 L.Ed. 126 (1938) (emphasis
> deleted). And whatever the meaning of "substantial" in other contexts,
> the threshold for such evidentiary sufficiency is not high. Substantial
> evidence, this Court has said, is "more than a mere scintilla." Ibid.; see,
> e.g., Perales, 402 U.S. at 401, 91 S. Ct. 1420 (internal quotation marks
> omitted). It means—and means only—"such relevant evidence as a
> reasonable mind might accept as adequate to support a conclusion."
> Consolidated Edison, 305 U.S. at 229, 59 S. Ct. 206. See Dickinson v.
> Zurko, 527 U.S. 150, 153, 119 S. Ct. 1816, 144 L.Ed.2d 143 (1999)

(comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019).

Samantha Drake applied for child disability benefits and supplemental security income under Titles II and XVI of the Social Security Act on February 20, 2015 and March 10, 2015, alleging an onset date of disability of September 30, 2013.[1] A hearing was held before an Administrative Law Judge ("ALJ"), and the ALJ found that Drake was not disabled during the relevant period and denied her application for benefits. Drake now appeals this decision, arguing that the ALJ's decision is not supported by substantial evidence.

However, after a review of the record, and mindful of the fact that substantial evidence "means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,'" Biestek, 139 S. Ct. at 1154, we find that substantial evidence supported the ALJ's findings in this case. Therefore, for the reasons set forth below, we will affirm the decision of the Commissioner.

---

[1] Drake's period of disability for purposes of her child disability benefits claim ran from her alleged onset date of September 30, 2013 through the age of 22, May 28, 2014. Her supplemental security income claim ran from her protected filing date of March 10, 2015 through the date of the ALJ's decision on May 11, 2021.

## II.   <u>Statement of Facts and of the Case</u>

Drake filed her claim for disability benefits on February 20 and March 10, 2015, alleging an onset date of September 30, 2013. (Tr. 14). Drake alleged disability due to the following impairments: fibromyalgia; depression; interstitial cystitis; hearing loss; and a learning disability. (Tr. 152). She was 21 years old at the time of her alleged onset of disability, had an eleventh-grade education, and had no past relevant work. (Tr. 27, 152).

With respect to Drake's impairments,[2] the medical record revealed the following: Drake was diagnosed with interstitial cystitis ("IC") in September of 2010 after complaining of frequent urinary tract infections and bladder pressure. (Tr. 602, 620). At a follow up appointment in December of 2010, it was noted that Drake had been started on medication but was not taking it and was not following the dietary restrictions she had been given. (Tr. 623).

Drake treated with Dr. Ilan Levinson, M.D., for psychotherapy and medication management in July of 2010. (Tr. 654). Dr. Levinson noted that Drake was returning to care at that time, and that she had dropped out of cyber school. (<u>Id.</u>) Drake reported decreased motivation, a depressed and anxious mood, racing

---

[2] Because Drake's appeal focuses on her mental limitations and her interstitial cystitis, we will limit our discussion to those impairments relevant to the plaintiff's appeal.

3

thoughts, and disruptive or aggressive behavior. (Id.) She was diagnosed with bipolar disorder and started on medications. (Id.) Drake continued to treat with Dr. Levinson in 2011, although treatment notes from October of 2013 indicated that Drake had not shown for her appointments since 2011. (Tr. 647). Drake reported being anxious and overwhelmed at this time, but her mental status examination revealed normal findings, and she was prescribed Abilify. (Tr. 647-48). At a follow up appointment, it was noted that Abilify calmed her down but she still got anxious. (Tr. 645). Her mental status examination again revealed normal findings. (Tr. 646).

Treatment notes in March of 2014 indicated that Drake had been diagnosed with fibromyalgia and her Abilify had been increased. (Tr. 641). In May of 2014, Drake reported that her stressors included health concerns, relationship problems, and family issues, including problems with her boyfriend. (Tr. 640). It was noted that Drake had poor concentration, she was overwhelmed and anxious, but she was making stable progress. (Id.)

In October of 2014, Drake underwent two bladder instillation treatments for her IC. (Tr. 844-45). However, after the second treatment, Drake presented to the emergency room at the direction of her OBGYN's office with sharp pains. (Tr. 726-31). Her condition was improved upon discharge, and she was given a prescription for pyridium. (Tr. 728). Drake followed up with her OBGYN, Dr. Radhika Ailawadi,

4

M.D., who noted that Drake had gone to the emergency room and was still experiencing pain. (Tr. 843). Dr. Ailawadi noted that Drake was noncompliant with her medications, and Dr. Ailawadi started her on new medication. (Id.)

Drake treated with Dr. Ailawadi, in May of 2015 and complained of bladder pain. (Tr. 840). The treatment notes from this visit indicated that Drake was noncompliant with her medications, and she was not adhering to the diet she was given. (Id.) Dr. Ailawadi gave her a list of bladder irritants and opined that this was the only thing Drake would be able to do for her condition. (Id.)

Treatment notes from February of 2016 indicate that Drake was suffering from chronic pain and was seeing a rheumatologist for her fibromyalgia, and that she followed up with Dr. Ailawadi for her IC. (Tr. 882). A physical examination in March of 2016 revealed abdominal pain but no frequent or painful urination and no urinary infections. (Tr. 889). However, treatment notes from April of 2017 noted that Drake's IC was stable. (Tr. 1097). These notes also revealed a normal mental status evaluation, and that Drake's panic attacks had improved. (Tr. 1096-97). A treatment note from June of 2017 noted that Drake had no abdominal pain, no increased frequency in urination, and no difficulty urinating, and she reported no depression. (Tr. 1115). In August, Drake reported that her depression was improving. (Tr. 1164). However, the following year in July of 2018, Drake again

5

reported symptoms of depression, but an examination revealed normal mood, affect, and judgment. (Tr. 1202-03, 1206). By September of 2019, Drake's depression was noted as stable, and a mental status examination revealed normal mood, affect, behavior, and thought content. (Tr. 1433).

In February of 2020, it was noted that Drake was seeing a psychologist for her anxiety and depression. (Tr. 1681). She was started on gabapentin. (Id.) Treatment notes from her psychologist at this time indicate that Drake was referred by her primary care physician due to feelings of frustration and sadness related to her chronic pain. (Tr. 1895). A mental status examination revealed an appropriate affect and dysphoric mood; clear speech; coherent thought content; good judgment; and fair concentration. (Tr. 1898). Her psychologist diagnosed her with adjustment disorder with mixed anxiety and depressed mood. (Tr. 1900).

Throughout 2020, Drake's psychology treatment notes revealed relatively normal mental status findings. For example, in March of 2020, she presented with a depressed mood but an appropriate affect, clear speech, and appropriate thought content. (Tr. 1927). Her psychologist noted that she was engaging in treatment and was compliant with therapy. (Id.) In April, Drake reported that her depression fluctuated, and she discussed wanting to increase her motivation. (Tr. 1998). Her psychologist noted that she had developed coping skills. (Id.) In June of 2020, Drake

reported feeling better emotionally. (Tr. 2024). At a visit with her pain management doctor in October of 2020, her mood and affect were appropriate, and she was in no distress. (Tr. 2055). Regarding her IC, in October 2020, Drake reported no frequent urinating or difficulty urinating. (Tr. 2094).

It is against this medical backdrop that the first ALJ held a hearing on October 26, 2017, and Drake's claims were subsequently denied on May 29, 2018. (Tr. 199). However, this decision was remanded by the Appeals Council and assigned to another ALJ. (Tr. 207-08). The second ALJ held two telephonic hearings, one on March 12, 2020, and one on March 9, 2021. (Tr. 105-11, 112-51). At the second hearing, both Drake and a Vocational Expert testified. (Tr. 112-51) By a decision dated May 11, 2021, the ALJ denied Drake's application for benefits. (Tr. 11-42).

In that decision, regarding her Title II claim, the ALJ first concluded that Drake had not attained the age of 22 as of her alleged onset date of September 30, 2013, and that she had not engaged in any substantial gainful activity since her alleged onset date. (Tr. 17). At Step 2 of the sequential analysis that governs Social Security cases, the ALJ found that from her alleged onset date through age 22, May 28, 2014, Drake had the following severe impairments: fibromyalgia, depression with anxiety, and bipolar disorder. (Tr. 18). The ALJ found Drake's IC to be a nonsevere impairment, reasoning that examination findings during the relevant

period were normal, there was no evidence of medically acceptable signs or laboratory findings associated with the impression, and Drake had not undergone any ongoing evaluation or treatment for this impairment. (Tr. 20).

As to her Title XVI claim, the ALJ found that Drake suffered from the following severe impairments: fibromyalgia degenerative disc and joint disease of the lumbar spine; depression with anxiety; adjustment disorder; unspecified depressive disorder; and unspecified anxiety disorder. (Tr. 28). The ALJ similarly found that Drake's IC was a nonsevere impairment, reasoning that for this supplemental security income period, Drake had only periodic acute treatment, and there was no longitudinal evidence of ongoing or follow up treatment or objective deficits on examination. (Tr. 32).

At Step 3, the ALJ determined that Drake did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments regarding her Title II claim. (Tr. 21-23). On this score, the ALJ found that Drake had moderate limitations in understanding, remembering, or applying information and concentrating, persisting, and maintaining pace, and had only mild limitations in interacting with others and adapting or managing oneself. (Tr. 22-23). The ALJ found identical limitations with respect to Drake's Title XVI claim. (Tr. 35-36).

Between Steps 3 and 4, the ALJ fashioned a residual functional capacity ("RFC"), considering Drake's limitations from her impairments. With respect to both the Title II claim and the Title XVI claim, the ALJ fashioned the following RFC:

> [T]he claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except: She could occasionally climb stairs and ramps, but never ladders, ropes, or scaffolds. She could occasionally balance, stoop, kneel, crouch, and crawl. She needed to avoid concentrated levels of vibration and hazards, defined as heights. She was limited to unskilled work activity as defined in the Dictionary of Occupational Titles (DOT) that is low stress, defined as only occasional decision making and only occasional changes in the work setting.

(Tr. 23-24, 36).

Specifically, in making the RFC determination, the ALJ considered the medical evidence, medical opinions, and Drake's testimony regarding her impairments. On this score, the ALJ considered the August 2015 opinion of Dr. Erin Urbanowicz, Psy.D., a state agency consultant, and found this opinion persuasive with respect to both the Title II and Title XVI claims. (Tr. 26, 39). Dr. Urbanowicz opined that Drake experienced mild to moderate limitations in the areas of functioning, and that she was capable of performing simple, routine, repetitive work in a stable environment. (Tr. 161-62). The ALJ gave these findings great weight, reasoning that they were well supported and consistent with the medical evidence

9

during the relevant time periods. (Tr. 26, 39). However, the ALJ declined to adopt Dr. Urbanowicz's finding that Drake was limited to one-to-two-step tasks, finding that this limitation was not supported by the longitudinal evidence which reflected normal mental status evaluations, routine and conservative outpatient treatment, and no evidence of hospitalizations or inpatient treatment. (Id.)

With respect to the Title XVI claim, the ALJ also considered the opinion of the consultative examiner, Dr. Kirsten McNelis, Ph.D., and found this opinion persuasive. (Tr. 40). Dr. McNelis opined that while Drake suffered from psychiatric and cognitive problems, they did not appear to be significant enough to interfere with her ability to function on a daily basis. (Tr. 868). The ALJ reasoned that this opinion was supported by Dr. McNelis' own examination as well as the longitudinal treatment record. (Tr. 40).

With respect to her physical limitations, the ALJ considered the opinion of a state agency consultant, Dr. Anne Zaydon, M.D., and found this opinion persuasive with respect to both the Title II and Title XVI claims. (Tr. 25, 39). Dr. Zaydon opined that Drake would be limited to a range of light work, in that she could lift and carry up to 20 pounds occasionally and 10 pounds frequently; sit, stand, and walk up to 6 hours in an 8-hour workday; and should avoid concentrated exposure to extreme cold, heat, and humidity. (Tr. 159-60). The ALJ found this opinion persuasive but

10

added additional postural limitations to Drake's RFC to account for all of the severe and nonsevere impairments identified by the ALJ, as well as in consideration of Drake's subjective complaints. (Tr. 25, 39).

The ALJ also considered Drake's testimony but ultimately found that Drake's complaints were not entirely consistent with the medical evidence of record. (Tr. 25, 37-39). Drake testified at the March 2021 hearing that at that time, she was not receiving psychological care or counseling. (Tr. 119). She stated that she was able to take care of her personal grooming needs and perform some light household chores, but that she got tired easily and had pain in her back. (Tr. 120). She testified that her pain made it hard for her to sleep, and that she could not stand more than 13 minutes at a time. (Tr. 123-24). She stated that she no longer took any medication because all of the medications she took made her sick. (Tr. 124). Regarding her IC, Drake testified that she had undergone two bladder instilliation treatments, and that the second treatment caused her so much pain that she stopped the treatment. (Tr. 137-38). Thus, she stated that the doctor gave her a diet to follow and that was how she was managing her condition, and that it was, to an extent, keeping it under control. (Tr. 138-39).

The ALJ ultimately found that Drake's complaints were not entirely consistent with the medical record. On this score, the ALJ noted that during the

relevant periods, Drake's treatment notes reflected normal physical and mental status findings. (Tr. 25, 37-39). During the child disability benefits period, the ALJ noted the findings of tender points regarding Drake's fibromyalgia, but further noted that the remainder of the treatment notes showed normal objective physical findings, normal mental status evaluations, and reflected routine and conservative treatment. (Tr. 25). During the supplemental security income period, the ALJ noted the benign imaging findings regarding her lumbar and cervical spine; the fact that Drake was not taking any medications due to side effects; the objective physical findings of full range of motion and 5/5 strength and reflexes; and the fact that Drake was not undergoing any treatment for her mental health. (Tr. 37-39).

Having arrived at this RFC assessment, the ALJ found at Step 4 that Drake has no past relevant work but ultimately found at Step 5 that Drake could perform work available in the national economy as an office helper, counter clerk, and marker. (Tr. 28, 41). Accordingly, the ALJ concluded that Drake did not meet the stringent standard for disability set by the Act and denied her claim. (Id.)

This appeal followed. (Doc. 1). On appeal, Drake contends that the ALJ erred in finding that her IC was a nonsevere impairment, and further, that the ALJ erred when she failed to limit Drake to simple, routine, repetitive tasks in her RFC. Finally, Drake raises a separation of powers argument, asserting that the ALJ and Appeals

Council were not constitutionally appointed at the time of the decision. This case is fully briefed and is, therefore, ripe for resolution. For the reasons set forth below, we will affirm the decision of the Commissioner.

## III. <u>Discussion</u>

### A. <u>Substantial Evidence Review – the Role of this Court</u>

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record.  See 42 U.S.C. §405(g); <u>Johnson v. Comm'r of Soc. Sec.</u>, 529 F.3d 198, 200 (3d Cir. 2008); <u>Ficca v. Astrue</u>, 901 F. Supp.2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Pierce v. Underwood</u>, 487 U.S. 552, 565 (1988).  Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. <u>Mason v. Shalala</u>, 994 F.2d 1058, 1064 (3d Cir. 1993). But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two

inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." <u>Consolo v. Fed. Maritime Comm'n</u>, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." <u>Leslie v. Barnhart</u>, 304 F. Supp.2d 623, 627 (M.D. Pa. 2003).

The Supreme Court has recently underscored for us the limited scope of our review in this field, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. <u>T-Mobile South, LLC v. Roswell</u>, 574 U.S. ——, ——, 135 S.Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. <u>Consolidated Edison Co. v. NLRB</u>, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." <u>Ibid.</u>; <u>see, e.g., Perales</u>, 402 U.S. at 401, 91 S.Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Consolidated Edison</u>, 305 U.S. at 229, 59 S.Ct. 206. <u>See Dickinson v. Zurko</u>, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

<u>Biestek</u>, 139 S. Ct. at 1154.

The question before this Court, therefore, is not whether the claimant is disabled, but rather whether the Commissioner's finding that she is not disabled is

14

supported by substantial evidence and was reached based upon a correct application of the relevant law. See Arnold v. Colvin, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence") (alterations omitted); Burton v. Schweiker, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); see also Wright v. Sullivan, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); Ficca, 901 F. Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

Several fundamental legal propositions which flow from this deferential standard of review. First, when conducting this review "we are mindful that we must not substitute our own judgment for that of the fact finder." Zirnsak v. Colvin, 777 F.3d 607, 611 (3d Cir. 2014) (citing Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005)). Thus, we are enjoined to refrain from trying to re-weigh the evidence. Rather our task is to simply determine whether substantial evidence supported the ALJ's findings. However, we must also ascertain whether the ALJ's decision meets the burden of articulation demanded by the courts to enable informed judicial review. Simply put, "this Court requires the ALJ to set forth the reasons for his

decision." Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 119 (3d Cir. 2000).

As the Court of Appeals has noted on this score:

> In Burnett, we held that an ALJ must clearly set forth the reasons for his decision. 220 F.3d at 119. Conclusory statements . . . are insufficient. The ALJ must provide a "discussion of the evidence" and an "explanation of reasoning" for his conclusion sufficient to enable meaningful judicial review. Id. at 120; see Jones v. Barnhart, 364 F.3d 501, 505 & n. 3 (3d Cir.2004). The ALJ, of course, need not employ particular "magic" words: "Burnett does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis." Jones, 364 F.3d at 505.

Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 504 (3d Cir. 2009).

Thus, in practice ours is a twofold task. We must evaluate the substance of the ALJ's decision under a deferential standard of review, but we must also give that decision careful scrutiny to ensure that the rationale for the ALJ's actions is sufficiently articulated to permit meaningful judicial review.

This principle applies with particular force to legal challenges, like the claim made here, based in part upon alleged inadequacies in the articulation of a claimant's mental RFC. In Hess v. Comm'r Soc. Sec., 931 F.3d 198, 212 (3d Cir. 2019), the United States Court of Appeals recently addressed the standards of articulation that apply in this setting. In Hess, the court of appeals considered the question of whether an RFC, which limited a claimant to simple tasks, adequately addressed moderate limitations on concentration, persistence, and pace. In addressing the plaintiff's

16

argument that the language used by the ALJ to describe the claimant's mental limitations was legally insufficient, the court of appeals rejected a *per se* rule which would require the ALJ to adhere to a particular format in conducting this analysis. Instead, framing this issue as a question of adequate articulation of the ALJ's rationale, the court held that, "as long as the ALJ offers a 'valid explanation,' a 'simple tasks' limitation is permitted after a finding that a claimant has 'moderate' difficulties in 'concentration, persistence, or pace.'" Hess v. Comm'r Soc. Sec., 931 F.3d 198, 211 (3d Cir. 2019). On this score, the appellate court indicated that an ALJ offers a valid explanation a mental RFC when the ALJ highlights factors such as "mental status examinations and reports that revealed that [the claimant] could function effectively; opinion evidence showing that [the claimant] could do simple work; and [the claimant]'s activities of daily living, . . . . " Hess v. Comm'r Soc. Sec., 931 F.3d 198, 214 (3d Cir. 2019).

In our view, the teachings of the Hess decision are straightforward. In formulating a mental RFC, the ALJ does not need to rely upon any particular form of words. Further, the adequacy of the mental RFC is not gauged in the abstract. Instead, the evaluation of a claimant's ability to undertake the mental demands of the workplace will be viewed in the factual context of the case, and a mental RFC is sufficient if it is supported by a valid explanation grounded in the evidence.

**B.**     __Initial Burdens of Proof, Persuasion, and Articulation for the ALJ__

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); see also 20 C.F.R. §404.1505(a).   To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy.  42 U.S.C. §423(d)(2)(A); 20 C.F.R. §404.1505(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. §404.1520(a). Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant

is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC").  20 C.F.R. §404.1520(a)(4).

Between Steps 3 and 4, the ALJ must also assess a claimant's residual functional capacity (RFC).  RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)."  Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); see also 20 C.F.R. §§404.1520(e), 404.1545(a)(1).  In making this assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis.  20 C.F.R. §404.1545(a)(2).

There is an undeniable medical aspect to an RFC determination, since that determination entails an assessment of what work the claimant can do given the physical limitations that the claimant experiences. Yet, when considering the role and necessity of medical opinion evidence in making this determination, courts have followed several different paths. Some courts emphasize the importance of medical opinion support for an RFC determination and have suggested that "[r]arely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant." Biller v. Acting Comm'r of Soc. Sec., 962 F. Supp. 2d 761, 778–79 (W.D. Pa. 2013)

(quoting <u>Gormont v. Astrue</u>, Civ. No. 11–2145, 2013 WL 791455 at *7 (M.D. Pa. Mar. 4, 2013)). In other instances, it has been held that: "There is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." <u>Titterington v. Barnhart</u>, 174 F. App'x 6, 11 (3d Cir. 2006). Further, courts have held in cases where there is no evidence of any credible medical opinion supporting a claimant's allegations of disability that "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." <u>Cummings v. Colvin</u>, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015).

These seemingly discordant legal propositions can be reconciled by evaluation of the factual context of these decisions. Those cases which emphasize the importance of medical opinion support for an RFC assessment typically arise in the factual setting where a well-supported medical source has identified limitations that would support a disability claim, but an ALJ has rejected the medical opinion which supported a disability determination based upon a lay assessment of other evidence. <u>Biller</u>, 962 F.Supp.2d at 778–79. In this setting, these cases simply restate the commonplace idea that medical opinions are entitled to careful consideration when making a disability determination, particularly when those opinions support a finding of disability. In contrast, when an ALJ is relying upon other evidence, such

as contrasting clinical or opinion evidence or testimony regarding the claimant's activities of daily living, to fashion an RFC courts have adopted a more pragmatic view and have sustained the ALJ's exercise of independent judgment based upon all of the facts and evidence. See Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006); Cummings v. Colvin, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015). In either event, once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by substantial evidence. Burns v. Barnhart, 312 F.3d 113, 129 (3d Cir. 2002); see also Metzger v. Berryhill, No. 3:16-CV-1929, 2017 WL 1483328, at *5 (M.D. Pa. Mar. 29, 2017), report and recommendation adopted sub nom. Metzgar v. Colvin, No. 3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21, 2017); Rathbun v. Berryhill, No. 3:17-CV-00301, 2018 WL 1514383, at *6 (M.D. Pa. Mar. 12, 2018), report and recommendation adopted, No. 3:17-CV-301, 2018 WL 1479366 (M.D. Pa. Mar. 27, 2018).

At Steps 1 through 4, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his or her past relevant work. Mason, 994 F.2d at 1064. Once this burden has been met by the claimant, it shifts to the Commissioner at Step 5 to show that jobs exist in significant number in the national economy that the claimant could

perform that are consistent with the claimant's age, education, work experience and RFC. 20 C.F.R. §404.1512(f); <u>Mason</u>, 994 F.2d at 1064.

The ALJ's disability determination must also meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." <u>Cotter v. Harris</u>, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. <u>Id.</u> at 706-07. In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." <u>Schaudeck v. Comm'r of Soc. Sec</u>., 181 F.3d 429, 433 (3d Cir. 1999).

## C.    <u>Step 2 Analysis</u>

At step-two of the sequential analysis, the ALJ determines whether a claimant has a medically severe impairment or combination of impairments. <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140-41, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987). An impairment is considered severe if it "significantly limits an individual's physical or mental abilities to do basic work activities. 20 C.F.R. 404.1520(c). An impairment is severe

if it is "something beyond 'a slight abnormality which would have no more than a minimal effect on an individual's ability to work.'" McCrea v. Comm'r of Soc. Sec., 370 F.3d 357, 360 (3d Cir. 2004) (quoting SSR 85-28, 1985 WL 56856 (1985)). The Court of Appeals is clear that the step-two inquiry is a *de minimis* screening device used to cast out meritless claims. McCrea, 370 F.3d at 360; Newell v. Comm'r of Soc. Sec., 347 F.3d 541, 546 (3d Cir. 2003). The burden is on the claimant to show that an impairment qualifies as severe. Bowen, 482 U.S. at 146, 107 S.Ct. 2287. Stancavage v. Saul, 469 F.Supp.3d 311, 331 (M.D. Pa. 2020).

However, "[f]ailing to find an impairment to be severe may be harmless when the ALJ does not deny benefits at that step and properly considered the condition in the remaining analysis." Edinger v. Saul, 432 F.Supp.3d 516, 531 (E.D. Pa. 2020). Indeed, "the analysis at step two is wholly independent of the analysis at later steps," and "not finding certain impairments severe at step two does not affect the ultimate disability determination." Alvarado v. Colvin, 147 F.Supp.3d 297, 311 (E.D. Pa. 2015). See Williams v. Kijakazi, No. 1:20-CV-946, 2021 WL 5759031, at *9 (M.D. Pa. Dec. 3, 2021).

### D.   **Simple Tasks RFC Analysis**

In Hess v. Comm'r Soc. Sec., 931 F.3d 198, 212 (3d Cir. 2019), the United States Court of Appeals addressed the question of whether an RFC which limited a

claimant to simple tasks adequately addressed moderate limitations on concentration, persistence, and pace. In terms that are equally applicable here, the Court noted that "[t]he relationship between 'simple tasks' limitations and 'concentration, persistence, or pace' is a close one." Id. Given how closely related these two concepts are, the appellate court rejected the notion advanced by the plaintiff that an RFC which limited a claimant to simple tasks failed as a matter of law to address moderate limitations on concentration, persistence, and pace. Instead, the Court concluded that:

> A limitation to "simple tasks" is fundamentally the same as one "to jobs requiring understanding, remembering, and carrying out only simple instructions and making only simple work-related decisions[.]" (App. at 33-34;) see Davis v. Berryhill, 743 F. App'x 846, 850 (9th Cir. 2018) (treating "understanding, remembering, and carrying out only simple instructions" as equivalent to "simple tasks"); Richards v. Colvin, 640 F. App'x 786, 790 (10th Cir. 2016) (referring to a limitation "to understanding, remembering, and carrying out only simple instructions and making only simple work-related decisions" as a "simple-work limitation[ ]"). Indeed, both formulations — the ALJ's and the more concise phrase "simple tasks" — relate to mental abilities necessary to perform "unskilled work." See 20 C.F.R. §§ 404.1568(a), 416.968(a) ("Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time."); SSR 96-9P, 1996 WL 374185, at *9 (July 2, 1996) (concluding that "unskilled work" requires "[u]nderstanding, remembering, and carrying out simple instructions" and "[m]aking ... simple work-related decisions"); cf. Richards, 640 F. App'x at 790 (treating "simple-work limitations" as similar to "unskilled work" limitations). So the parties' reliance on case law related to "simple tasks" is appropriate and helpful.

Hess, 931 F.3d at 210–11.

Having rejected a *per se* rule finding that simple task RFCs are legally inadequate to address moderate limitations in concentration, persistence, and pace, the Court of Appeals found that, in this setting, the issue was one of adequate articulation of the ALJ's rationale, holding that "as long as the ALJ offers a 'valid explanation,' a 'simple tasks' limitation is permitted after a finding that a claimant has 'moderate' difficulties in 'concentration, persistence, or pace.' " Id. at 211. On this score, the appellate court indicated that an ALJ offers a valid explanation for a simple task RFC when the ALJ highlights factors such as "mental status examinations and reports that revealed that [the claimant] could function effectively; opinion evidence showing that [the claimant] could do simple work; and [the claimant]'s activities of daily living, which demonstrated that [s]he is capable of engaging in a diverse array of 'simple tasks[.]'" Id. at 214.

### E.    The ALJ's Decision is Supported by Substantial Evidence.

In this setting, we are mindful that we are not free to substitute our independent assessment of the evidence for the ALJ's determinations. Rather, we must simply ascertain whether the ALJ's decision is supported by substantial evidence, a quantum of proof which is less than a preponderance of the evidence but more than a mere scintilla, Richardson, 402 U.S. at 401, and "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion." <u>Pierce</u>, 487 U.S. at 565. Judged against these deferential standards of review, we find that substantial evidence supported the decision by the ALJ that Drake was not disabled. Therefore, we will affirm this decision.

At the outset, Drake contends that the ALJ erred when she found Drake's IC to be a nonsevere impairment. As we have noted, the ALJ found this impairment to be nonsevere during the child disability benefits period because there were no abnormal findings and no ongoing treatment for this condition during this time period. Subsequently, the ALJ found this impairment to be nonsevere during the supplemental security income period because Drake had only acute periodic treatment and there were no objective deficits on examination.

We find that this decision by the ALJ is supported by substantial evidence. Indeed, during the child disability benefits period, while Drake had some complaints of urinary tract infections and bladder pressure, she did not undergo any treatment. Moreover, while she was counseled about her diet, treatment notes reflect that she was not compliant with that diet. During the supplemental security income period, Drake underwent two bladder instillation procedures, the second of which caused her to experience severe pain. She initially took medication for her condition but stopped after experiencing side effects. Thus, her OBGYN told her that the only way

to control the condition was to follow the recommended diet, and the record indicates that Drake did not follow that diet, and that her condition was under better control when she did. Moreover, during the relevant period, examination findings consistently showed no urinary frequency or difficulty and no abdominal pain.

Thus, we cannot conclude that the ALJ erred in finding that Drake's IC was a nonsevere impairment. As we have explained, the burden is on the claimant to show that her condition is severe. Here, the record reflected only periodic treatment, coupled with noncompliance with directives from her physicians. Moreover, the record contained normal examination findings throughout the relevant period.

Additionally, the plaintiff contends that the state agency consulting physician found her IC to be severe, and thus, the ALJ's failure to include this as a severe impairment was error. At the outset, it is well settled that "[a]n ALJ is entitled generally to credit parts of an opinion without crediting the entire opinion." Durden v. Colvin, 191 F.Supp.3d 429, 455 (M.D. Pa. 2016). Moreover, we find that even if the ALJ's failure to find Drake's IC to be a severe impairment was error, any error was harmless, as the ALJ stated that all of Drake's impairments, including nonsevere impairments, were considered in fashioning her RFC.

On this score, Social Security appeals are subject to harmless error analysis. Therefore:

> [A]ny evaluation of an administrative agency disability determination must also take into account the fundamental principle that: "'No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result.'" Moua v. Colvin, 541 Fed.Appx. 794, 798 (10th Cir. 2013) quoting Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir. 1989). Thus, ALJ determinations in Social Security appeals are subject to harmless error analysis, Seaman v. Soc. Sec. Admin., 321 Fed.Appx. 134, 135 (3d Cir. 2009) and "the burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." Shinseki v. Sanders, 556 U.S. 396, 409, 129 S. Ct. 1696, 1706, 173 L.Ed. 2d 532 (2009).

Metzger v. Berryhill, No. 3:16-CV-1929, 2017 WL 1483328, at *4 (M.D. Pa. Mar. 29, 2017), report and recommendation adopted sub nom. Metzgar v. Colvin, No. 3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21, 2017). In this regard "we apply harmless error analysis cautiously in the administrative review setting." Fischer–Ross v. Barnhart, 431 F.3d 729, 733 (10th Cir. 2005). However:

> In Social Security appeals courts may apply harmless error analysis when assessing the sufficiency of an ALJ's decision. Seaman v. Soc. Sec. Admin., 321 Fed.Appx. 134, 135 (3d Cir. 2009). "Under the harmless error rule, an error warrants remand if it prejudices a party's 'substantial rights.' An error implicates substantial rights if it likely affects the outcome of the proceeding, or likely affects the 'perceived fairness, integrity, or public reputation of judicial proceedings.'" Hyer v. Colvin, 72 F. Supp. 3d 479, 494 (D. Del. 2014).

Harrison v. Berryhill, No. 3:17-CV-618, 2018 WL 2051691, at *5 (M.D. Pa. Apr. 17, 2018), report and recommendation adopted, No. 3:17-CV-0618, 2018 WL 2049924 (M.D. Pa. May 2, 2018).

28

In the instant case, while the ALJ did not find Drake's IC to be a severe impairment, the ALJ did consider all of Drake's impairments in fashioning her RFC. Indeed, the ALJ discussed the relatively benign examination findings related to Drake's IC in her discussion of the RFC and Drake's limitations. Further, the ALJ limited Drake to a light work RFC that actually imposed additional postural limitations on Drake's RFC that were not included in the state agency opinion that was given great weight. Therefore, we find that any error regarding this Step 2 analysis was harmless and does not require a remand.

Next, Drake contends that the ALJ's decision is not supported by substantial evidence because the RFC ailed to include limitations to simple, routine, repetitive tasks, a limitation which was found by the state agency physician whose opinion was given great weight. On this score, the RFC fashioned by the ALJ limited Drake to unskilled, low stress work with only occasional decision making and changes in the work setting. As we have explained, the <u>Hess</u> court did, in fact, equate "unskilled work" with a limitation to "simple tasks." <u>Hess</u>, 931 F.3d at 210-11 ("A limitation to 'simple tasks' is fundamentally the same as one 'to jobs requiring understanding, remembering, and carrying out only simple instructions and making only simple work-related decisions'") (citations omitted). <u>See also</u> 20 C.F.R. § 404.1568(a) ("Unskilled work is work which needs little or no judgment to do simple duties that

can be learned on the job in a short period of time"); C.S. v. Comm'r of Soc. Sec., 2021 WL 5195702, at *7 n.3 (D.N.J. Nov. 9, 2021); Gaydosh v. Comm'r of Soc. Sec., 2020 WL 5084016, at *1 n.1 (W.D. Pa. Aug. 26, 2020); Starr v. Saul, 2020 WL 1975080, at *16 n.40 (E.D. Pa. April 24, 2020). Moreover, we have consistently found that such a limitation to unskilled, low stress work adequately accounts for a claimant's moderate limitations in concentration, persistence, and pace. See e.g., Chopko v. Kijakzi, 2023 WL 1864879, at *9-10 (M.D. Pa. Feb. 9, 2023); Hennebaul v. Kijakazi, 2022 WL 17093366, at *9 (Nov. 21, 2022); see also Bonner v Saul, 2020 WL 4041052, at *16 (M.D. Pa. July 17, 2020) (finding a limitation to unskilled work and simple, routine tasks sufficient to account for moderate limitations in concentration, persistence, and pace). Accordingly, we find that this RFC determination is supported by substantial evidence.

In closing, the ALJ's assessment of the evidence in this case complied with the dictates of the law and was supported by substantial evidence. This is all that the law requires, and all that a claimant can demand in a disability proceeding. Thus, notwithstanding the argument that this evidence might have been viewed in a way which would have also supported a different finding, we are obliged to affirm this ruling once we find that it is "supported by substantial evidence, 'even [where] this court acting *de novo* might have reached a different conclusion.' " Monsour Med.

Ctr. v. Heckler, 806 F.2d 1185, 1190–91 (3d Cir. 1986) (quoting Hunter Douglas, Inc. v. NLRB, 804 F.2d 808, 812 (3d Cir. 1986)). Accordingly, under the deferential standard of review that applies to appeals of Social Security disability determinations, we find that substantial evidence supported the ALJ's evaluation of this case.

### F.   **Appointments Clause**

Finally, the plaintiff contends that this case must be remanded for a *de novo* hearing because the ALJ and the Appeals Council were not constitutionally appointed at the time of the underlying decisions. The plaintiff argues that under the Federal Vacancies Reform Act ("FVRA"), 5 U.S.C. § 3346(a), the ALJ and Appeals Council were not properly appointed by Nancy Berryhill, the former Acting Commissioner of Social Security, because she was serving as the Acting Commissioner past the 210-day statutory term while the presidential nomination at that time, former Commissioner Andrew Saul, was pending appointment. For the following reasons, we are not persuaded by the plaintiff's position; rather, we will adopt the majority of courts' interpretation of the FVRA in this setting, and we find that the former Acting Commissioner was constitutionally appointed at the time the ALJ and Appeals Council were appointed in this case.

The plaintiff relies on the arguments made in <u>Brian T.D. v. Kijakazi</u>, 580 F.Supp.3d 615 (D. Minn. 2022) and <u>Richard J.M. v. Kijakazi</u>, 2022 WL 959914 (D. Minn. Mar. 30, 2022). The plaintiffs in those cases argued that because Andrew Saul was nominated after Berryhill's term as Acting Commissioner had already expired, Berryhill could not have resumed the role as Acting Commissioner once President Trump nominated Saul for the position roughly eight months later. <u>Brian T.D.</u>, 580 F.Supp.3d at 627; <u>Richard J.M.</u>, 2022 WL 959914, at *5. Those courts held that Ms. Berryhill was not constitutionally appointed at that time, as § 3346 did not contain a "spring back" provision that would have allowed her to resume her position as Acting Commissioner after her 210-day term had expired. However, as we will explain, these courts represent the minority view, and the majority of courts that have address this issue have concluded that § 3346, by its plain terms, allowed Ms. Berryhill to resume her position as Acting Commissioner following the President's nomination of Andrew Saul.

Section 3346(a) provides:

(a) Except in the case of a vacancy caused by sickness, the person serving as an acting officer as described under section 3345 may serve in the office --

   (1) for no longer than 210 days beginning on the date the vacancy occurs; **or**
   (2) subject to subsection (b), once a first or second nomination for the office is submitted to the Senate, from the date of such

> nomination for the period that the nomination is pending in the
> Senate.

5 U.S.C. § 3346(a) (emphasis added). Thus, subsection (a), by its clear terms,

contains the disjunctive "or." Courts interpreting § 3346(a) in this context have thus

held that because subsections (a)(1) and (a)(2) are set forth in the disjunctive, (a)(2)

cannot be said to be merely a tolling provision subject to the period set forth in (a)(1).

As the Fourth Circuit recently explained:

> Our interpretive inquiry, as is often the case, is answered by the
> ordinary meaning of the statute's text. See Niz-Chavez v. Garland, ——
> U.S. ——, 141 S. Ct. 1474, 1480, 209 L.Ed.2d 433 (2021). Subsections
> 3346(a)(1) and 3346(a)(2) are joined by the word "or." The "ordinary
> use" of the word "or" "is almost always disjunctive, that is, the words
> it connects are to 'be given separate meanings.' " United States v.
> Woods, 571 U.S. 31, 45–46, 134 S.Ct. 557, 187 L.Ed.2d 472 (2013)
> (quoting Reiter v. Sonotone Corp., 442 U.S. 330, 339, 99 S.Ct. 2326,
> 60 L.Ed.2d 931 (1979)). So when two provisions are joined by an "or,"
> each provision should typically be accorded its "independent and
> ordinary significance." Reiter, 442 U.S. at 338–39, 99 S.Ct. 2326.
> "Congress' use of the word 'or' makes plain that" each provision "was
> not intended to modify" the other. Id. at 339, 99 S.Ct. 2326. In other
> words, the "disjunctive 'or' usually ... separates words or phrases in the
> alternate relationship, indicating that either of the separated words or
> phrases may be employed without the other." 1A Norman Singer &
> Shambie Singer, Sutherland Statutes and Statutory Construction §
> 21:14 (7th ed. 2022).
>
> The statute at issue here authorizes an acting officer to serve under §
> 3346(a)(1) for up to 210 days beginning when the vacancy occurs or
> under § 3346(a)(2) while a nomination is pending in the Senate. 5
> U.S.C. § 3346(a). The word "or" signals that we should give §
> 3346(a)(2) its "independent and ordinary significance," not read it "to
> modify" § 3346(a)(1). Reiter, 442 U.S. at 338–39, 99 S.Ct. 2326. So

the most natural interpretation of (a)(2) is that it authorizes an independent period of acting service while a nomination is pending regardless of whether the nomination occurred during the (a)(1) period. In line with this interpretation, (a)(2) delineates its own beginning and ending independent of (a)(1)—authorizing acting service "from the date of such nomination" until the nomination is no longer "pending in the Senate." 5 U.S.C. § 3346(a)(2). Appellants' interpretation of (a)(2) as exclusively a tolling provision subordinate to (a)(1) thus deprives (a)(2) of its independent and ordinary significance and contravenes the most natural reading of the statute's disjunctive "or."

Moreover, "[t]he word 'or' has an inclusive sense (A or B, or both) as well as an exclusive one (A or B, not both)," and is "generally used in the inclusive sense." <u>Varga v. Colvin</u>, 794 F.3d 809, 815 (7th Cir. 2015) (citing, inter alia, Garner's Dictionary of Legal Usage 639 (3d ed. 2011)). When a waiter offers a patron "coffee or dessert," an ordinary English speaker understands that he can have both coffee and dessert if he so chooses. Without compelling context to the contrary, an acting officer may serve under § 3346(a)(1), § 3346(a)(2), or both. In fact, appellants themselves do not advocate reading the "or" here as exclusive: They accept that an acting officer may serve under both (a)(1) and (a)(2) if a nomination occurs during the (a)(1) period. Berryhill's prior service under § 3346(a)(1) therefore did not preclude her from serving under § 3346(a)(2).

<u>Rush v. Kijakazi</u>, -- F.4th --, 2023 WL 2877081, at *3 (4th Cir. April 11, 2023).

Similarly, the Eighth Circuit has held that § 3346(a) permits an individual to assume the role of Acting Commissioner while a nomination is pending, even if that individual had already served for the 210-day period. <u>Dahle v. Kijakazi</u>, 62 F.4th 424, 429 (8th Cir. 2023). In addition, numerous district courts have held the same, finding that Ms. Berryhill was properly serving as Acting Commissioner and thus, properly appointed Social Security ALJs. <u>See e.g.</u>, <u>Alicia M. v. Comm'r of Soc. Sec.</u>,

2023 WL 2744135, at *10 (D. Idaho March 31, 2023); Wilson v. Comm'r of Soc. Sec., 2023 WL 2728729, at *5 (W.D.N.C. March 30, 2023); Schneider v. Comm'r of Soc. Sec., 2023 WL 2480861, at *8 (E.D. Ca. March 13, 2023); Parker v. Kijakazi, 2023 WL 2180069, at * 2 (D.S.C. Feb. 23, 2023); Tamara G. v. Comm'r of Soc. Sec. Admin., 2023 WL 2504912, at *4-5 (N.D. Tex. Feb 13, 2023); Ortiz-Rivera v. Kijakazi, 2023 WL 25353, at *17 (M.D. Pa. Jan. 3, 2023) (Mehalchick, C.M.J.); Hernandez v. Kijakazi, 2022 WL 17751355, at *12-14 (D.N.J. Dec. 19, 2022).

We agree with the greater weight of authority and find that Ms. Berryhill was properly serving as the Acting Commissioner of Social Security upon Andrew Saul's nomination, and therefore, the ALJ and Appeals Council members were properly appointed at the time of the underlying decision in this case. Accordingly, a remand is not warranted here.

## IV.   **Conclusion**

Accordingly, for the foregoing reasons, the final decision of the Commissioner denying these claims will be AFFIRMED.

An appropriate order follows.

                                        *s/ Martin C. Carlson*
                                        Martin C. Carlson
                                        United States Magistrate Judge

DATED: April 24, 2023